# THE "LIHOLIHO," THE INTER-ISLAND STEAM NAVIGATION COMPANY *vs.* 1206 BAGS OF SUGAR, THE ALLIANCE MARINE AND GENERAL ASSURANCE COMPANY, Limited; W. G. IRWIN & COMPANY, and the HAWAIIAN SUGAR COMPANY, Intervenors.

## IN ADMIRALTY—LIBEL FOR SALVAGE.

HEARING, OCTOBER 2, 1893.    DECISION, OCTOBER 24, 1893.

### JUDD, C.J., BICKERTON AND FREAR, JJ.

(1) A schooner completed taking in her cargo of sugar at the port of Makaweli, Kauai, at dusk and soon after started on her voyage to Honolulu. Held, leaving the port in the night time was not *per se* evidence of negligence.

(2) The fact that the salving vessel and the schooner from which the sugar was salved belonged to the same owners does not prevent salvage being awarded against the cargo salved.

(3) The libellants were under contract to convey the sugar from Makaweli to Honolulu and their vessels were under general orders to assist each other. These facts do not prevent the rescue of the sugar from being a salvage service.

(4) The action of the winds and the waves being the proximate cause of the disaster and the miscalculation of the master being the remote cause, the loss was occasioned by a peril of sea.

(5) The schooner L. was loaded and started in the early evening to go to sea from the port of Makaweli, Kauai. The master was at the helm; the crew hoisted the foresail and mainsail, hove on the anchor until it broke ground, then began to hoist the jib. The wind was light and off shore on the port bow, as the schooner was coming round. The course out of the harbor was S.W. The wheel was hard to port and lashed. The schooner payed off very slowly and the mate fearing she might touch the reef let the anchor go. Shortly after this it was again hoisted, the mainsail-peak was lowered and jib-sheet hauled to windward and belayed, and when the schooner was within two points of her course she struck the reef on the windward or port side of the harbor near the entrance, and

stuck fast. The steamer Iwalani was sent for and when she arrived she anchored, and fastened a hawser to the schooner and kept a steady strain on it to keep her from being lifted more on the reef by the swell, and discharged the sugar rapidly with her own boats, and finally pulled the schooner off into deep water. The L. had knocked a hole in her and afterwards sank, and was a total loss. This service was attended with but little danger to the libellants' salving vessel, the sea being smooth and the wind light, and did not require great skill or any extra expense, and occupied only about twelve hours: Held, that one-quarter of the net proceeds of the cargo salved would under these circumstances be proper compensation for the service.

## Opinion of the Court, by Judd, C.J.

Circuit Judge Cooper heard this case below and decreed that the libellant is entitled to salvage from the sugar saved from the wreck of the schooner Liholiho, and that the amount of such salvage be fifty per cent. of the net proceeds of the sale of said sugar paid into Court. We adopt the findings of fact and of law as decided by Judge Cooper in his opinion rendered on the 21st September, 1893, with the exception of the amount of the salvage. Following is the decision upon which the decree appealed from is based :

" On the evening of August 9, 1893, the schooner Liholiho went ashore on the reef forming the southern line of Makaweli harbor, Kauai ; her cargo consisted of 1450 bags of sugar. Soon after the schooner grounded the captain sent his boat ashore for assistance, but was unable to secure it, after which the crew pulled over to Waimea, where the steamer Iwalani lay at anchor, and requested the captain to come at once to the assistance of the Liholiho. The Iwalani arrived at the wreck some time between midnight and 2 o'clock, and after a short consultation with the captain of the Liholiho, it was decided that the best thing to do was to transfer the sugar from the Liholiho to the Iwalani. The first attempt was made with the Liholiho's boat, but, owing to the heavy swell and roll of the schooner, the boat was broken. After which the Iwalani's boats were called into action, and 1158 bags of sugar were taken aboard the

Iwalani. Both the crew of the Liholiho and the Iwalani participated in the work, and after daylight assistance was rendered by men from the shore. Soon after the arrival of the Iwalani a hawser was passed to the Liholiho and fastened to the mainmast, and a steady strain was put upon it for the purpose of keeping her from going farther upon the reef. Before the sugar was fully out the hawser parted; after which it was carried forward and made fast to the foremast, and an effort was made to pull her off the reef, which was finally successful. After being pulled off the reef, the schooner began to make water rapidly, and the remaining sugar was wet, and 58 bags of the remainder was taken out and landed on the wharf; the captain of the Iwalani refusing to take this wet sugar for fear of damaging the sugar he had already taken aboard. The Liholiho soon afterwards sank, and the remainder of the cargo became a total loss. The Iwalani proceeded on her voyage, and in due course landed the 1158 bags of sugar at Honolulu.

On the 16th of August, 1893, the libellants filed their libel in this Court praying for an attachment and sale of the sugar, and claiming twenty-five hundred dollars for salvage service.

The Alliance Marine and General Assurance Company, insurers of a part of the cargo, W. G. Irwin & Co., agents, and the Hawaiian Sugar Company, owners of a portion of the sugar, interpleaded for the purpose of disputing the claim of the libellants. An order of sale was issued, the sugar was sold, and the sum of $3635.67 was realized and paid into the registry of the Court.

The steamer "Iwalani" and the schooner "Liholiho" both belonged to the libellants.

The libellants were transporting the sugar under a contract with the owners for the carrying of all their freight, and under the contract no restrictions were placed upon the libellants as to the character of the vessel to be used. A shipping receipt was signed by the captain of the "Liholiho," which is in the usual form in use in this country.

It is contended by the intervenors that the cause of the stranding of the schooner was the incompetency and negligence of the master, and that the libellant being the owner of both the wrecked and salving vessels, it cannot profit by its own wrong.

The evidence tended to show that the "Liholiho" got under way between 9 and 10 o'clock in the evening with the wind blowing a moderate breeze from the east or off shore. There is some conflict of evidence as to just how the start was made, but the weight of the evidence was to the effect that the schooner was lying at anchor head to the wind, that the mainsail and foresail were set and as the anchor broke ground the jib was hoisted and belayed to port, the sheets of both main and foresail were well eased off and neither of the sails drawing. The course out from where the schooner started was S.W. and in order to avoid the lee shore the captain deemed it necessary to go out on the port tack. The "Liholiho" was shown to be slow in paying off, and in this case was making too much headway toward the shore. Upon seeing which the mate who was forward, without the order of the captain, dropped the anchor, and the mainsail and jib were also lowered. After remaining in that position for about half an hour a second attempt was made under foresail and jib, the mainsail having been hoisted full up at the throat but with peak slack. This second start was made when nearer the reef and for that reason under less favorable circumstances than the first, but the schooner had nearly gained her course when she struck on the reef head on and almost immediately swerving broadside to.

There can be no doubt but there is a wide difference between willful negligence and an error of judgment. The captain of the "Liholiho" was shown to be a master mariner of long standing and his general competency was not questioned. And although with a fair wind and calm sea the presumption would seem to be against him, yet upon all the circumstances I fail to find him chargeable with negligence. If he were to make the attempt again he might consider it

wise to adopt a different method, but that even would not be evidence of negligence in his former misfortune. Leaving port in the night time is not negligence per se and I do not find in this case that it was the proximate cause of the stranding. I think therefore that the disaster was due to a miscalculation on the part of the captain of the "Liholiho." In many cases where it has been necessary to prove a loss by a peril of the sea, the courts have held that where the remote cause of the disaster was the negligence of the master or crew, yet if the action of wind and wave was the proximate cause of the loss it was a peril of the sea. As, where sugar was being transported from the shore to the ship in an offing, by means of a launch and the crew went to sleep and the launch thereby drifted upon the shore. *Walker vs. Maitland,* 5 B. & Ald., 171. And where the master threw out too much ballast and the ship was overset in a squall. *Dixon vs. Sadler,* 5 M. & Wels., 405. Also see the case of the *Montana,* 17 Fed. Rep., 377.

It is also contended that the libellant being under a special contract to transport this sugar, and that all the steamers of the company were under general orders to go to the assistance of other vessels of the company in distress, that this is not a salvage service. There is nothing in the contract to support the theory that the parties contemplated anything of this kind; the contract does not extend to the situation before us, nor do I find that the general orders to the captains of steamers in regard to rendering assistance changes the result.

I am therefore of the opinion that the services rendered by the "Iwalani" entitles the libellant to salvage; the fact that the vessels were both owned by the libellant being no bar to a recovery.

The *Miranda,* 3 Ad. & Ec., 561.

*P. M. S. Co. vs. Ten Bales Gunny Bags,* 3 Sawyer, 187.

The only remaining question is the amount which shall be awarded as compensation for the service. The intervenors endeavored to show that the "Iwalani," soon after her

arrival, attempted to pull the "Liholiho" off by means of the hawsers made fast first to her main, and afterwards to her foremast, and that by so doing the "Liholiho's" keel was damaged and that she then began to leak, and that had it not been for the leak so caused, the "Liholiho" would have remained intact and that her own crew and boat could have safely landed the cargo on the wharf.

The testimony of the captains of both the "Liholiho" and "Iwalani" was to the effect that no effort was made to haul the "Liholiho" off until the bulk of the sugar had been taken out, only sufficient strain being kept on the hawser to keep her from going further on the reef. The "Liholiho" was lying stern to the sea, and every wave as it came towards the shore caused her to lift and then drop again when the wave had passed. She was pounding so hard that the shoe or false keel had broken off early in the morning of the 10th, and from all appearances she would have knocked a hole in her bottom before noon of that day. The Liholiho's boat was broken at the first attempt to remove the sugar, which rendered it impossible for the crew to do anything without assistance towards saving the cargo, and is strong argument against the position taken by the intervenors. The cargo was a perishable one, and I feel convinced that had it not been for the timely service rendered by the Iwalani, it would have proved a total loss. There is but little aid to be derived from decided cases as to the amount to be awarded, each case depending upon its peculiar circumstances. Taking all things into consideration, I feel warranted in this case in awarding fifty per cent. of the net proceeds of the sale as evidenced by the Marshal's return.

The libel is drawn against 1206 bags of sugar, but upon footing up the number of bags as set forth in the body of the libel, there is found to be 1216 bags, which is the number sold, and the calculation is based upon the later amount."

BY THE COURT.

As regards the amount of salvage decreed, we are of the opinion that it is excessive.   We do not question the principle laid down by Chief Justice Marshall in " The Sibyl" (4 Wheaton, 98), that " in a case of civil salvage, where the amount of salvage is discretionary, appeals should not be encouraged upon the ground of minute distinctions of merit; nor will the court reverse the decision of an inferior court, unless it manifestly appears that some important error had been committed."   In 1865 instructions were given by the British Board of Trade to the receivers of wrecks of Great Britain, which embodied the results of the decisions of English and American Courts of Admiralty—" There must be considered in a claim for salvage :

(1) The degree of danger from which the lives or property are rescued.

(2) The value of the property saved.

(3) The risk incurred by the salvors.

(4) The value of the property employed by the salvors in the wrecking enterprise, and the danger to which it was exposed.

(5) The skill shown in rendering the service.

(6) The time and labor occupied.   The *Sandringham*, 10 Fed. R., 573.

We adopt these principles as applicable to cases of salvage.

" Salvage is a reward or bounty, exceeding the actual value of their services, given to those by means of whose labor, intrepidity and perseverance a ship or her goods have been saved from shipwreck or other dangers of the seas."   1 Bell. Com., 592.

Judge Story in the *Henry Eubank*, 1 Sum., 400, said, " The law does not stop with a mere allowance to the owner (of the salving vessel) of an adequate indemnity for the risk so taken.   It has a more enlarged policy and a higher aim.   It looks to the common safety and interest of the whole commercial world in cases of this nature ; and it bestows upon the owner a liberal bounty to stimulate him to a just zeal in

the common cause, and not to clog his voyages with narrow instructions which should interdict his master from salvage service. * * * The law offers not a premium of indemnity only but an ample reward, measured by an enlightened liberality and forecast."

The following are cases bearing upon this matter:

*The Camanche*, 8 Wall., 448. Here the Supreme Court of the United States refused to reverse the salvage award by the Court below. A wrecking company agreed for $110,000 to save the cargo of the ship Aquilla which had sunk in San Francisco harbor. The cargo consisted of the ironwork and materials for the construction of the monitor "Camanche," also her guns, shot, shell and stores, etc., all of which were valued at $400,000. The salvage service lasted about three months and $70,000 was spent by the libellants.

*The Sandringham*, 10 Fed. R., 573. In this case a steamer, worth, with her cargo and freight, valued at $200,000, was stranded on Cape Henry, within 100 yards of the shore, where the currents of the Chesapeake Bay, encountering those of the ocean, are often very dangerous. Salvors, with a large force of vessels, wrecking apparatus and men, after a week of hard and dangerous labor, in which the highest degree of skill was shown, succeeded in getting off both vessel and cargo so successfully as to allow them to proceed on their voyage after repairs to the ship. One fourth of the combined value of vessel and cargo, and of half the freight, was awarded as salvage.

In the case of *The Fairchild*, 30 Fed. R., 700, a schooner (the Fairchild) was run aground on an exposed bank six miles out to sea, and began to pound heavily and was abandoned by the master and crew, and was found by another vessel the next day eleven miles out to sea and drifting seaward, abandoned, with the hatches open, and the waves dashing over the deck, and in danger of filling. She sold for $2051.51. Held, she was derelict and five hundred dollars was allowed for salvage to the owners and crew of the salving vessel the Mary Odell.

In the case of *The Tregurno*, 50 Fed. Rep., 946, the Court (January, 1892), awarded twenty-five per cent. as salvage. The steamer Tregurno was stranded on the Florida coast twenty-five miles from Cape Florida, the nearest anchorage. She was appraised with her cargo of cotton at $205,496. The cotton saved was transported 158 miles to Keywest. The wrecking force consisted of fifteen vessels aggregating 489 tons and nearly 200 men and the salvors were engaged twenty-five days.

In· *The Egypt*, 17 Fed. R. 359, the salvors were engaged eight days, discharged between 1100 and 1200 bales of cotton and the court gave one-fifth upon an agreed estimation of $250,000, in addition to $4,256.55 which amount had been expended by the wreckers.

In the case of *The Kimberley*, 40 Fed. R., 289, the steamship "Kimberley," valued with her cargo at $490,000, was stranded on December 1st, 1887, off False Cape Shoals, Atlantic Ocean. The vessel was 350 feet long, 3760 gross tonnage, and had been driven 3000 feet from deep water and thrown high upon the shore broadside to the sea and imbedded in the quicksand—a most perilous position. The libellants (the Baker Salvage Co.,) came at once to her rescue and finally succeeded in getting the vessel off on January 26th, 1888. Some nine vessels valued at $164,000 were employed in the service. The vessels and men incurred services and continued risks on account of storms off that coast. A large part of the cargo was moved 2,000 feet in surf boats, it being impossible to get a larger vessel nearer the Kimberley. ·The Kimberley was so filled with water as to render her engines useless, and very little assistance was received from her. The libellants' actual outlay was $26,000. Held, that in addition to the quantum meruit allowance, libellant was entitled to one-fifth of the value saved, viz., $98,000. The quantum meruit was the $26,000 expended, and $20,000 for use of salvor's tugs, surf boats, anchors, chains, hawsers, steam pumps, &c., at $375 a day. The case was appealed and the salvors compromised for $100,000.

Two cases are cited where fifty per cent. was ·allowed as salvage : *Peisch vs. Ware*, 4 Cranch, 347 (1808.) The ship Favourite was discovered adrift in the bay of Delaware deserted by her crew, with her masts gone by the board and without anchors, cables or rudder, and in danger of being carried out to sea. Her cargo was wines and spirits, and it was unladen with considerable labor and landed. Three of the Justices thought the salvage allowed was too great.

In the case of the *R. D. Bibber*, 33 Fed. Rep., 55, this vessel, loaded with railroad iron, went ashore in Galveston Bay. The vessel and cargo were salved by libellants under a contract with the master for 50 per cent. of the value ; wrecking crews were paid extra sums, and pumps of large cost for that locality used, and the vessel saved at the risk of serious damage to the property engaged in the work of salvage, one of the lighters being injured and the crews suffering much hardship, and the weight of evidence showing that the cost of saving railroad iron wrecked on the gulf beach, on basis of work and labor, is 50 per cent. of its value. Held, that the contract was reasonable, and a proper allowance for salvage would be 50 per cent. of the value of the property saved.

There is now no fixed rule as to the value of salvage services, but except in rare cases of merit fifty per cent. is the maximum. "It is now the practice to allow a fair compensation for the actual services, and one-half will be given only where both considerable energy and great exertion have been displayed or a considerable danger incurred by the salvors. If the service rendered to derelicts be of extraordinary merit, even as much as two-thirds of their value may be awarded to the salvors, *but it is with great reluctance that more than a moiety is rewarded.*" 21 Am. & Eng. Encyc., p. 693.

Considering the various ingredients of meritorious salvage laid in the early part of this decision, we find : (1.) That the sugar being easily dissolved by contact with water was in great danger of loss while in the schooner Liholiho lying on the

reef and would have been lost but for the timely assistance of the Iwalani.

(2.) The value of the property saved was not large, the sugar brought $3,635.67, and all of the 1450 bags were saved but 234 bags.

(3.) There was some risk to the men in the boats while discharging the cargo—but it was not much more than is often incurred by the boatmen of our coasting steamers in taking their own cargo in. The fact that 1158 bags were taken out and boated to the Iwalani and 58 to the dock between midnight (some of the witnesses say 4 A. M.) and 9 A. M. the next morning, shows that the risks encountered were not very hazardous.

(4.) The salvors employed their steamer "Iwalani," valued by them at $50,000. The "Liholiho" was valued at $5000. The Iwalani used her own boats, men and hawser and did not have to supply any extra appliances. While performing this service the Iwalani was in no especial danger—no more than when taking in or discharging cargo at many of her usual ports on Kauai. The weather was good, the wind light and off shore and the sea not high; and she had put a light on the wharf so that she knew her position and came up and anchored in safety.

(5.) The nature of the salvage service was simple and did not require great skill. The Iwalani lay at anchor half of one night and part of the next day, keeping a steady strain with a hawser to keep the Liholiho from going further on the reef and finally pulled the schooner off the rocks, but she sunk and became a wreck. The Iwalani's boats unloaded the schooner as rapidly as possible. She was not thereby detained from making her usual voyage on time.

(6.) The time occupied was short, as we have seen, and the labor on the part of the boats' crews was severe while it lasted, but not much more than when ordinarily employed in boating off sugar. The distance over which the sugar was boated was but 65 fathoms. The officers and crew of the Iwalani are not claimants in this libel.

It is said that where the value of property saved is small a higher proportion will be awarded, and a smaller proportion in cases where the value is large. 21 Am. & Eng. Encyc., 690. In the case of the Alaska valued with her cargo at $1,041,000, and towed into port $2\frac{1}{2}$ per cent. was awarded. 23 Fed. R., 597.

When the value of the vessel salved was small—$11,000, —salvors who had abandoned their voyage for the salving service, and consumed three days therein and rescued the vessel from a dangerous position, one-third was allowed. *The Maggie Willett*, 27 Fed. R., 519. *The case of Scows*, 9, 16 and 24, 45 Fed. R., 901, was one of "unusual merit." The value of the property salved was $20,000 and the Court awarded 25 per cent.

Upon a review of the whole case and of the precedents cited, we think that one-fourth of the net proceeds of the property saved is ample compensation for the salvage service of the libellants. Costs of Court to be first paid out of proceeds.

Decree accordingly.

*F. M. Hatch*, for libellants.

*C. W. Ashford* and *C. Creighton*, for intervenors.